# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, as subrogee of
ROCKCLIFF ENERGY II, LLC,

    Plaintiff,

v.                                                                    No. 2:20-cv-00079-WJ-CG

SEDONA CONTRACTING, INC. and
MOSAIC POTASH CARLSBAD INC.,

    Defendants,

and

MOSAIC POTASH CARLSBAD INC.,

    Cross-Claimant,

v.

SEDONA CONTRACTING, INC.,

    Cross-Defendant,

and

MOSAIC POTASH CARLSBAD INC.,

    Third-Party Plaintiff,

v.

ROCKCLIFF OPERATING NEW MEXICO, LLC,

    Third-Party Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING
## IN PART AND DENYING IN PART THIRD-PARTY DEFENDANT'S
## MOTION TO DISMISS

**THIS MATTER** is before the Court on the Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim [Doc. 18] filed by Third-Party Defendant Rockcliff Operating New Mexico, LLC ("Rockcliff"). Defendant Mosaic Potash Carlsbad Inc. ("Mosaic") asserted two claims against Rockcliff: breach of contract and negligence. For the reasons stated in this Opinion, the Court finds that Mosaic's breach of contract claim is precluded by law and that Mosaic also failed to adequately plead its negligence claim. However, Mosaic requested leave to amend its Third-Party Complaint. Accordingly, the Court **GRANTS in part** Rockcliff's 12(b)(6) Motion to Dismiss in that Mosaic's breach of contract claim is dismissed, but Mosaic is allowed to amend its deficient negligence claim.

## BACKGROUND

This action arises out of insurance subrogation claims brought by St. Paul Fire and Marine Insurance Company ("St. Paul"), as subrogee of Rockcliff,[1] against Defendants Sedona Contracting, Inc. ("Sedona") and Mosaic. St. Paul seeks to recover cleanup costs incurred after the release of waste saltwater on Mosaic's property from a pipeline owned and operated by Rockcliff.

Predecessors in interest to Rockcliff and Mosaic formed the "Saltwater Disposal Agreement" (the "Agreement") wherein the surface estate owner, now Mosaic, conveyed a lease to an operator, now Rockcliff, to conduct wastewater disposal activities using a disposal well, pipelines, and other related surface equipment located on Mosaic's property. Separately, Mosaic contracted to allow Sedona to temporarily use a portion of Mosaic's property to construct a nearby bridge. It is undisputed that, while conducting construction activities on Mosaic's property, Sedona

---

[1] Mosaic filed its third-party claims against Rockcliff Operating New Mexico LLC, a wholly owned subsidiary of Rockcliff Energy II, LLC, collectively referred to by the parties and the Court as "Rockcliff." Doc. 14 (St. Paul's Second Amended Complaint) at 1; Doc. 18 (Rockcliff's Motion to Dismiss) at 1.

punctured a saltwater waste disposal polyline[2] (the "polyline") connected to the Candelario 24-1 Well (the "well"). Sedona notified Mosaic and Mosaic clamped the pipeline to stop the release. However, the line was punctured a second time, whereupon Rockcliff was notified and replaced the pipeline. St. Paul covered remediation costs for Rockcliff and filed the underlying subrogation action. Doc. 25 (Joint Status Report) at 2.

Mosaic responded to St. Paul's complaint by filing a Third-Party Complaint in which it alleged that Rockcliff negligently maintained, operated, and repaired the polyline and breached the Agreement. Doc 17 (Third-Party Complaint) at 15–16.

In response, Rockcliff filed the subject Motion to Dismiss Mosaic's Third-Party claims for failure to state a claim. Doc. 18 (Rockcliff's Motion). Rockcliff maintains that Mosaic's breach of contract claim "relies on an indemnification argument prohibited by New Mexico law" and that Mosaic "has not alleged facts establishing that Rockcliff breached any duty, caused any damage, or that Mosaic has damages other than those already compensated by Rockcliff." *Id.* at 1. In response, Mosaic argues both claims survive scrutiny under Fed. R. Civ. P. 12(b)(6), but if the Court concludes otherwise, requests leave to amend pursuant to Fed. R. Civ. P. 15. Doc. 21 (Mosaic's Reply) at 11.

## LEGAL STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

---

[2] A "polyline" is a polycarbonate pipeline used in the saltwater waste disposal process. The Candelario 24 #1 Swd Polyline transports waste saltwater from a storage tank battery to a filtration system within the well.

*Twombly*, 550 U.S. at 556). Plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In reviewing a motion to dismiss, the Court must assume all the complaint's factual allegations are true, but it is not bound to accept legal conclusions, including any "legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Accordingly, the Court "should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn. Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). In deciding whether the plaintiff's stated claim for relief is adequate, the Court views "the totality of the circumstances as alleged in the complaint in the light most favorable to [the plaintiff]." *Jones v. Hunt*, 410 F.3d 1221, 1229 (10th Cir. 2005). The essential question is whether the plaintiff has nudged his or her claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

While the sufficiency of a complaint must generally rest on its contents alone, the court may also consider at the motion to dismiss stage: "documents that the complaint incorporates by reference" and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Gee v. Pacheco*, 627 F.3d 1178, 1886 (10th Cir. 2010).

This case is based on federal diversity jurisdiction. Because Mosaic's claims sound in state law and the parties have stipulated that New Mexico law governs, the Court must apply New Mexico law. Doc. 25 (Joint Status Report) at 3. In doing so, the Court must either follow the decisions of the New Mexico Supreme Court or attempt to predict what the New Mexico Supreme

4

Court would do. *See Coll v. First Am. Title Ins. Co.,* 642 F.3d 876, 886 (10th Cir. 2011); *Federated Serv. Ins. Co. v. Martinez*, 529 F. App'x 954, 957 (10th Cir. 2013) ("If a state's highest court has not addressed a dispositive legal issue, a federal court 'must determine what decision the state court would make if faced with the same facts and issues' by considering state intermediate appellate court decisions, 'decisions of other states, federal decisions, and the general weight and trend of authority.'") (quoting *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988)).

## DISCUSSION

### I.     Mosaic is Granted Leave to Amend to Cure Deficient Negligence Claim

Under New Mexico law, a negligence claim "requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 134 N.M. 43, 47–48 (2003); *see Payne v. Hall*, 136 N.M. 380, 386 (2004) (stating that negligence requires proof of four elements: "duty, breach of that duty by failing to conform to the required standard, proximate cause, and loss or damage"). Negligence is based upon the "concepts of foreseeability of harm to the person injured and of a duty of care toward that person." *Herrera*, 134 N.M. at 48 (quoting *Ramirez v. Armstrong*, 100 N.M. 538, 541 (1983), overruled on other grounds by *Folz v. State*, 110 N.M. 457 (1990)).

In the instant case, Mosaic alleges that Rockcliff breached its duty to "exercise reasonable and ordinary care in its use of Mosaic's property . . . by negligently maintaining, operating, and repairing" the polyline. Doc. 17 (Third-Party Complaint) at 15. Although the parties agree Sedona punctured the polyline, Mosaic contends that Rockcliff could have reasonably anticipated damage to the polyline because it was buried under the road without protective casement. Mosaic further alleges that there were additional releases of wastewater from the polyline before and after Sedona

punctured it and this demonstrates that Rockcliff knew there were problems with the polyline. Mosaic states that Sedona's puncture of the polyline caused damage to its property. Additionally, while Mosaic admits that Rockcliff engaged in clean-up efforts thereafter, Mosaic contends the "damage to the property remains unknown" because Rockcliff failed to perform groundwater monitoring. *Id.* at 16.

Whether a duty exists is a question of law. *Schear v. Bd. of County Comm'rs*, 101 N.M. 671, 672 (1984). To establish duty in a negligence case, New Mexico law "focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *Herrera*, 134 N.M. at 48. "Every person has a duty to exercise ordinary care for the safety of the person and the property of others." N.M.R.A. U.J.I. Civ. 13-1604. Rockcliff entered into a lease agreement to operate the well to dispose of saltwater on Mosaic's land. Doc. 17-2 (Agreement) at 4. Pursuant to the Agreement, Rockliff owed Mosaic a duty to exercise ordinary care in its use of Mosaic's property.

Mosaic, however, failed to plausibly plead that Rockliff breached its duty or caused any damage to Mosaic's property. To establish breach, the factfinder must be able to determine "what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." *Bober v. N.M. State Fair*, 111 N.M. 644, 650 (1991). A defendant's breach must also "foreseeably and substantially cause[] the [plaintiff's] specific injury." *Herrera*, 134 N.M. at 58.

Mosaic appears to assert that Rockcliff breached its duty to exercise ordinary care by failing to cover the polyline with a protective casement. Mosaic alleges that because the polyline "was buried under County Road 741" and because "[t]he release at issue . . . was not the first, nor was it th[e] last" that Rockcliff could have reasonably anticipated damage to Mosaic's property. Doc.

6

17 (Third-Party Complaint) at 15. Mosaic, however, provides no factual details to support its claim that there were any other releases from the polyline at issue. Nor does it provide any support for its contention that the polyline was vulnerable to puncture without a protective casement. Mosaic pleads no factual details that could plausibly support the determination that Rockcliff reasonably anticipated damage to Mosaic's property. Instead, Mosaic merely provided a formulaic recitation of the elements of breach and causation.

Moreover, Mosaic alleges no facts that could plausibly support damages. To the contrary, Mosaic pleads that "damage to the property remains unknown." Doc. 17 (Third-Party Complaint) at 15. "Damages based on surmise, conjecture or speculation cannot be sustained. Damages must be proved with reasonable certainty." *Mascarenas v. Jaramillo* 111 N.M. 410, 415 (1991). Not only is Mosaic unable to speculate about the extent of damages, it fails to plead anything beyond the hypothetical possibility that Mosaic suffered any damages at all.

As outlined above, Mosaic has failed to meet its burden to state a facially plausible claim to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss. If a party fails to plausibly plead its claim, upon request, Fed. R. Civ. P. 15 allows the party to amend its deficient pleading to promote resolution on the merits. Any party may amend its pleading with the court's leave, which should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Id.*

Here, Mosaic requested leave to amend its Third-Party Complaint pursuant to Fed. R. Civ. P. 15. Doc. 21 (Mosaic's Response) at 11. Rockcliff did not address Mosaic's request in its reply brief. Therefore, the Court considers Rockcliff to have abandoned any claim that amendment is prejudicial or futile. *See Ratts v. Bd. Of County Comm'rs*, 141 F. Supp. 2d 1289, 1314 (finding that plaintiff abandoned claim by failing to respond adequately to defendant's motion for summary judgment). Considering this case is in the early phase of pretrial discovery and this is Mosaic's first request for leave to amend, the Court sees no reason to deny Mosaic's request.

Accordingly, **the Court grants Mosaic leave to amend its Third-Party Complaint within 30 days of this Order**. Mosaic is admonished that it should not expect to be given the opportunity to cure defects in future pleadings.

## II.     Mosaic's Breach of Contract Claim is Precluded by Law

Mosaic alleges that Rockcliff breached the parties' Saltwater Disposal Agreement by pursuing claims against Mosaic in the underlying action through St. Paul, Rockcliff's subrogee.

The Saltwater Disposal Agreement, formed by the parties' predecessors in interest, was drafted to "reduce to writing" the parties' "mutual agreement as to the operation of the [Candelario 24 -1] Well for the purpose of the disposal of saltwater and other produced fluids." Doc. 17-2 (Agreement) at 4. It states that Rockcliff is the operator of the well and that Mosaic is the owner of the surface estate upon which it is located. *Id.* Pursuant to the Agreement, Mosaic grants Rockcliff "the right to make use of the Land for the disposal of salt water and other fluids into the Well" and "the right to construct, maintain, and operate all equipment and facilities required for the disposal of salt water and other fluids." *Id.* Mosaic also grants Rockcliff an easement to maintain, operate, build, and repair pipelines, storage tanks, and other appurtenances for the

disposal of saltwater to and from the well. In exchange, Rockcliff agreed to make annual lease payments and provide 2.5 percent of all skim oil[3] collected at the tank battery of the well. *Id.* at 5.

According to Mosaic, Rockcliff breached the Agreement by failing to comply with the following indemnity provision contained in paragraphs 5 and 7 of the contract:

> [Rockcliff] shall hold [Mosaic] harmless from any losses, damages, liabilities, or claims of any kind which may be suffered by or brought against [Mosaic] as a consequence of, in connection with, or resulting from the existence and/or operations on this Lease, the Well, and [Rockcliff's] related facilities and operations.

Doc. 17-2 (Agreement) at 5. Mosaic alleges that this indemnity provision by itself renders Rockcliff's subrogee's suit against Mosaic a breach of the Agreement.

Rockcliff, on the other hand, contends that the indemnity provision requires Rockcliff to indemnify Mosaic for Mosaic's own negligence and is therefore void under Section 56-7-2 of the New Mexico Anti-Indemnity Act ("NMAIA"). Doc. 18. (Rockcliff's Motion) at 4. As a result, Rockcliff maintains that Mosaic's breach of contract claim is precluded by law.

Mosaic, however, disputes that the NMAIA § 56-7-2 applies in the context of waste water pipelines, arguing first that the section's scope is limited to oil and gas wells, not wastewater pipelines, and second that "the NMAIA was not designed to prohibit a landowner from requiring indemnification from a pipeline owner using its land." Doc. 21 (Mosaic's Response) at 7–8.

**A.     NMAIA Applies to the Saltwater Disposal Agreement**

Section 56-7-2 of the New Mexico Anti-Indemnity Act voids "agreements, covenants, and promises to indemnify" pertaining to "oil, gas or water wells and mineral mines:"

> An agreement, covenant or promise, foreign or domestic, contained in, collateral to or affecting an *agreement pertaining to a well for oil, gas or water, or mine for a mineral*, within New Mexico, that purports to indemnify the indemnitee against loss

---

[3] In the saltwater waste disposal process, "skim oil" is the oil that is filtered and separated from wastewater at the tank battery. Skim oil is often drained into a storage tank for sale.

> or liability for damages arising from the circumstances specified in Paragraph (1), (2) or (3) of this subsection is against public policy and is void:
>
> (1) the sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee;
> (2) the sole or concurrent negligence of an independent contractor who is directly responsible to the indemnitee; or
> (3) an accident that occurs in operations carried on at the direction or under the supervision of the indemnitee, an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee.

N.M. Stat. Ann. § 56-7-2(A) (*emphasis* added). Section B further defines "an agreement pertaining to a well for oil, gas or water, or mine for a mineral" as an agreement "concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging or otherwise rendering services in connection with a well drilled for the purpose of producing or disposing of oil, gas or other minerals or water." N.M. Stat. Ann. § 56-7-2(B)(1).

"[T]he public policy behind § 56-7-2(A) is to promote safety. The indemnitee, usually the operator of the well or mine, will not be allowed to delegate to subcontractors his duty to see that the well or mine is safe." *Guitard v. Gulf Oil Co.*, 100 N.M. 358, 361–62 (Ct. App. 1983). The statute incentivizes the well operator to monitor the safety of the operation knowing he will be responsible for his own negligence. *Id.* at 362.

Notably, "Section 56-7-2 is an example of an extraordinary limited class of statutes whose very subject is the enforceability of contracts that contravene public policy." *Pina v. Gruy Petroleum Mgmt. Co.*, 139 N.M. 619, 623 (Ct. App. 2006). The New Mexico legislature decided to "expressly subordinate freedom of contract to well site safety," indicating that "the Legislature believed promoting safety at well sites to be an especially important public policy." *Id.*

On its face, § 56-7-2 applies to the parties' Agreement. The contract, which governs the disposal of salt water and other fluids from Rockcliff's well, is "an agreement pertaining to a well for . . . water, or mine for a mineral, within New Mexico." N.M. Stat. Ann. § 56-7-2(A). The contract also grants Rockcliff "the right to construct, maintain, and operate all equipment and facilities required for the disposal of salt water," an easement "to install, operate, maintain, repair and replace pipelines for the transportation of saltwater to and/or from the Well," and "the right to build storage tanks and other appurtenances" needed to dispose of saltwater. Doc. 17-2. (Agreement) at 4. These operations fall within the specifically enumerated activities in § 56-7-2(B), which include activities related to . . . reworking, repairing, [and] improving…a well drilled for the purpose of producing or disposing of . . . water." N.M. Stat. Ann. § 56-7-2(B). Moreover, § 56-7-2(B) also applies more broadly to any contract "otherwise rendering services in connection with a well drilled for the purpose of producing or disposing of . . . water," which could encompass collecting skim oil and disposing of wastewater from the well. *Id.*

Mosaic, however, argues that NMAIA does not apply to the Agreement because "the specifically enumerated activities in N.M.S.A. § 56-7-2(B) do not encompass the issues before the Court in this case." Doc. 21 (Mosaic's Response) at 8. Mosaic relies entirely on *Holguin v. Fulco Oil Services, LLC*, claiming that it suggests that the legislature intended the activities in § 56-7-2(B) to be limited to production activities at the well head. 149 N.M. 98, 104 (Ct. App. 2010). Mosaic concludes that, under *Holguin*, the Agreement does not fall within the scope of the NMAIA because the polyline is not located at the well head but is instead transmitting wastewater to a tank battery across Mosaic's property.

Nothing in *Holguin* precludes the Court from finding that the activities in the Agreement fall within the scope of the NMAIA. Although *Holguin* reasoned that the statute's scope did not

11

extend beyond "production activities at the well head," the court did so in holding that an off-site, post-production gas processing system called a "slug catcher" was not within the ambit of § 56-7-2. 149 N.M. 98, 104. The Court is unconvinced that Rockcliff's saltwater waste disposal activities can be considered post-production or off-site. The pipelines and tank batteries that Mosaic now maintains are "not located at a drilling site or well head" are so essential to the disposal of saltwater "to and/or from the Well" that the Agreement contains provisions to build and operate them in its first clause. Doc. 17-2 (Agreement) at 4. Furthermore, New Mexico oil regulations consider pipelines and tank batteries to be operational components of wells. *See* N.M. Code. R. § 19.15.29.12(C)(2) (in the context of oil and gas development and production, "production equipment" includes "production tanks, wellheads, and pipelines"). In sum, while *Holguin* narrowed the scope of the NMAIA by finding it inapplicable to an off-site gas processing system, the decision did not construe the statute so narrowly as to preclude on-site production activities directly connected to the well head.

Accordingly, the Court finds that the operations governed by the Agreement fall within the scope of NMAIA § 56-7-2(B). The contract is thus "an agreement pertaining to a well for oil, gas or water" that is subject to the NMAIA. Having found that the NMAIA applies, the Court must now determine whether the contract's specific indemnity provision is rendered void by the NMAIA.

### B. The Indemnity Clause in the Agreement is Void

Under the NMAIA, if the Agreement's indemnity provision purports to indemnify Mosaic for Mosaic's own negligence, then the provision is void. Thus, because Mosaic's breach of contract claim is based solely on the indemnity clause, it would be precluded as a matter of law. The NMAIA states that "an agreement covenant, or promise . . . that purports to indemnify the

indemnitee against loss or liability for damages arising from . . . the sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee . . . is against public policy and is void." N.M. Stat. Ann. § 56-7-2(A). An indemnitee is "one who receives indemnity from another," and "indemnify" means "to give (another) security against a loss suffered." *Indemnitee* and *Indemnify*, Black's Law Dictionary (7th ed. 1999).

New Mexico law voids indemnity clauses whereby one party agrees to hold an indemnitee harmless against its own negligence only if the parties' intention to do so is "clear and unequivocal." *Metro. Paving Co. v. Gordon Herkenhoff & Assocs.*, 66 N.M. 41, 43 (1959). However, an express reference to the indemnitee's own negligence is not necessary when the provision's language is broad enough to encompass it. *Id.* at 44–45. In *Metro Paving Co.*, the indemnitor bound himself to save the indemnitee harmless "from all suits and actions of every nature and description brought . . . on account of the construction of this work." *Id.* at 46. The Court held that that "the all-embracing language used in the indemnity provisions clearly indicate[d] an intention to save harmless" indemnitee from all liability, including indemnitee's own negligence. *Id.* at 45.

In the instant case, the Court finds that the indemnity provision in the Agreement has the effect of relieving Mosaic from liability for its own negligent acts. The provision states that:

> [Rockcliff] shall hold [Mosaic] harmless from *any losses, damages, liabilities, or claims of any kind* which may be suffered by or brought against [Mosaic] as a consequence of, in connection with, or resulting from the existence and/or operations on this Lease, the Well, and [Rockcliff's] related facilities and operations.

Doc. 17-2 (Agreement) at 5 (*emphasis* added). Although the indemnity provision does not explicitly say that Rockcliff must hold Mosaic harmless for Mosaic's negligence, it contains the same "all-embracing language" found in the *Metro Paving Co* indemnity provision. 66 N.M. at

46. By indemnifying Mosaic against "any losses, damages, liabilities, or claims of any kind," the clause accomplishes the same purpose as expressly indemnifying Mosaic against its own negligence. Doc. 17-2 (Agreement) at 5.

Mosaic argues that, even if the NMAIA voids the Agreement's indemnity provision, the statute was never intended to prohibit a landowner from requiring indemnification from a well operator conducting operations on its land. Mosaic bases its argument on § 56-7-2(D), which states: "Nothing in [§ 56-7-2] . . . deprives an owner of the surface estate of the right to secure indemnity from a lessee, operator, contractor, or other person conducting operations for the exploration of minerals on the owner's land." N.M.S.A. § 56-7-2(D). Mosaic, however, fails to address that the primary purpose of the NMAIA is to promote well site safety by requiring parties to be responsible for their own negligence. *Holguin*, 149 N.M. at 101. Therefore, even if § 56-7-2 is not designed to prohibit a landowner owner from securing indemnity from a lessee or operator, it does prevent an indemnitee from securing indemnity against its own negligence in the same context. *See* N.M.S.A. § 56-7-2(A).

The Court finds that the indemnity provision in the Agreement requires Rockcliff to indemnify Mosaic for Mosaic's own negligence. NMAIA Section § 56-7-2(A) therefore renders the provision void. Mosaic's breach of contract claim relies solely upon the voided indemnity provision and it therefore fails as a matter of law.

## CONCLUSION

Defendant Mosaic failed to plausibly plead its negligence claim against Third-Party Defendant Rockcliff; however, Mosaic requested leave to amend its pleading which the Court will allow. Mosaic's breach of contract claim is precluded by the NMAIA and is therefore without

merit. For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Third-Party Defendant Rockcliff's Motion to Dismiss as follows:

- Mosaic's negligence claim is **DISMISSED WITH LEAVE TO AMEND**.

- Mosaic's breach of contract claim is **DISMISSED WITH PREJUDICE**.

   **IT IS SO ORDERED.**

_____<br>
**CHIEF UNITED STATES DISTRICT JUDGE**